# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

OLGA G. VENEGAS,

      Plaintiff,

vs.                                    CIVIL NO. _____

CITY OF LAS CRUCES, NEW MEXICO,
CHRISTOPHER CARRILLO, FELICIANO
GARCIA, ANTHONY SEPULVEDA,
SEBERO TORRES, JOE TRISTE, AND
UNKNOWN SUPERVISORS,

      Defendants.

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### I.  Introduction

Plaintiff has brought claims under 42 U.S.C. § 1983 against various police officers for two encounters she had with the Las Cruces Police Department.  As to all claims, the officers assert the defense of qualified immunity.  As set forth below, the officers are entitled to summary judgment as to all claims.

### II.  Applicable Standard

Summary judgment is properly granted if there is no genuine issue of material fact and the moving parties are entitled to judgment as a matter of law.  FED. R. CIV. P. 56.  FED. R. CIV. P. 56 mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).

### III.  Statement of Material and Undisputed Facts

1.      On June 9, 2007, Officer Christopher Carrillo was dispatched to a welfare check regarding a woman lying on a sidewalk.  He arrived at 4:22 p.m.  ***See***, **Affidavit of Carrillo, attached hereto as Exhibit A[1] at ¶¶ 2-3.**

2.      Plaintiff was lying across the sidewalk in such a position that pedestrians would have to step over her in order to use the sidewalk.  **Exhibit A at ¶ 6; Affidavit of Garcia, attached hereto as Exhibit B at ¶ 5.**

3.      Plaintiff was periodically yelling, causing a group of neighbors to gather.  **Exhibit A at ¶ 7.**

4.      Officer Carrillo saw a neighbor approach Plaintiff and touch her shoulder.  Plaintiff yelled at the neighbor "Get away from me." ***Id.* at ¶ 8.**

5.      Officer Carrillo attempted to speak with Plaintiff.  However, she ignored him.  She also made statements such as "Leave me alone" and "Don't touch me." ***Id.* at ¶ 10.**

6.      Fire Department personnel and ambulance company personnel had also arrived.  ***Id.* at ¶ 11.**

7.      At the time of the arrival of the Fire Department personnel, Plaintiff was abusive, disorderly, yelling at those around her, combative, aggressive, uncooperative and refused to answer questions.  ***See***, **Affidavit of Caldwell, attached hereto as Exhibit C at ¶ 8; Affidavit of Hall, attached hereto as Exhibit D at ¶ 6; Affidavit of Smith, attached hereto as Exhibit E at ¶ 7.**

8.      The ambulance company assumed patient care.  **Exhibit C at ¶ 12; Affidavit of Daniels, attached hereto as Exhibit F at ¶ 5.**

9.      The Fire Department never treated Plaintiff.  **Exhibit C at ¶ 17; Exhibit D at ¶ 12; Exhibit E at ¶ 6; Exhibit F at ¶ 29.**

10.     An EMT attempted to give Plaintiff a sternum rub (a medical procedure).  Plaintiff grabbed the EMTs hand and threw it back.  She used profanity and stated "Don't touch me." Plaintiff seemed angry at the EMT.  **Exhibit A at ¶ 12; Exhibit C at ¶ 18.**

---

[1] Most of the affidavits used in this memorandum have been borrowed from a case Plaintiff brought under state law.

11.     An EMT attempted to take Plaintiff's pulse.  In response, Plaintiff cocked her arm back, clenched her fist and attempted to administer a backhand blow to the EMT.  **Exhibit B at ¶¶ 7-9; Exhibit F at ¶¶ 5-6.**

12.     EMTs do not treat patients who are violent.  If a patient is violent or disruptive, it is standard procedure for police officers to ensure the safety of the EMTs before the EMTs provide assessment or treatment.  ***See*, Affidavit of Andersen, attached hereto as Exhibit G at ¶ 10.**

13.     The EMTs were unable to treat Plaintiff due to her being extremely combative.  They requested the police officers' help.  **Exhibit B at ¶ 12; Exhibit F at ¶ 7.**

14.     Officer Carrillo explained to Plaintiff that they were there to help her, to make sure that she was O.K. and that they needed to get her name and address so that they could contact her family.  **Exhibit A at ¶ 33.**

15.     By this time a crowd had gathered.  ***Id.* at ¶ 34.**

16.     One of the neighbors who arrived on the scene mentioned that she believed that Plaintiff had a history of seizures.  ***Id.* at ¶ 35.**

17.     Officer Carrillo asked the neighbor if she knew where Plaintiff lived.  The neighbor indicated that she believed she could find the home.  Officer Carrillo asked the neighbor to visit Plaintiff's home in an attempt to make contact with a family member.  The neighbor did so but returned and said that no one was home.  ***Id.* at ¶ 37.**

18.     The reason Officer Carrillo asked the neighbor to attempt to find Plaintiff's home rather than go himself was because, at the time, he was the only officer on the scene.  He did not wish to leave the scene because the duty of a police officer in situations where a patient is violent or non-cooperative with EMTs is to secure the scene so that the EMTs may safely treat the patient.  Officer Carrillo could not have done so had he gone to Plaintiff's home.  ***Id.* at ¶ 38.**

19.     At this point, Officer Garcia arrived on the scene.  ***Id.* at ¶ 39.**

20.     Officer Garcia told Plaintiff "We were called out because we were concerned.  These people are here to help you.  I am here to make sure they are okay and you are okay" or words to that effect.  Officer Garcia also told Plaintiff "if you are lying on the floor (sic) because you want to, that's okay.  We'll go." or words to that effect.  **Exhibit B at ¶¶ 14-15.**

21.     Officer Garcia repeatedly asked Plaintiff questions.  While he was doing so, Plaintiff yelled at him but otherwise ignored him.  **Exhibit A at ¶ 42.**

22.     Plaintiff was not wearing a bracelet, medallion on her neck or any other indicator that she suffered from a medical condition.  **Exhibit B at ¶ 16; Deposition of Venegas, attached hereto as Exhibit H at p. 20, line 19 to p. 22, line 22; p. 23, lines 4-11; Police Interview of Venegas, attached hereto as Exhibit I at p. 16, line 23 to p. 17, line 3; p. 17, lines 18-21.**

23.     Plaintiff was holding a purse in her left hand.  Officer Garcia wished to look through Plaintiff's purse in order to search for medications which would give him a clue as to whether she suffered from a medical condition and to obtain her identification.  The reason Officer Garcia wished to obtain Plaintiff's identification was to contact a family member through the Police Department's computerized record system.  Often when the police obtain the identification of a person suffering from a medical condition, the record system will provide the name of a relative.  The police then contact a relative and inquire into the subject's medical history.  This allows the officer to make the proper decision as to what to do with the subject.  **Exhibit B at ¶ 16.**

24.     Officer Garcia told Plaintiff that he was going to get her purse.  As he began to pick up Plaintiff's purse, Plaintiff pulled the purse away.  She stated "let go of my purse, motherfucker." *Id.* **at ¶ 17.**

25.     Plaintiff then grabbed Officer Garcia's fingers.  She tried to twist and break his fingers by bending them backwards and sideways at the joints, causing him considerable pain. **Exhibit B at ¶ 18; Exhibit F at ¶ 13.**

26.     Plaintiff appeared coherent to Officer Garcia when she was attempting to break his fingers.  **Exhibit B at ¶ 19.**

27.     Officer Garcia asked Plaintiff "What is wrong with you?  If you want to lie here, you can do it."  He explained to Plaintiff that if she would answer a few questions, they would leave her alone.  By that, Officer Garcia meant questions related to her medical condition.  *Id.* **at ¶ 20.**

28.     Up to this point Officer Garcia was concerned that Plaintiff may have been experiencing some sort of medical problem.  He became convinced that Plaintiff's conduct was not

related to a medical condition due to the fact that she was using profanity, acting extremely aggressively and attempting to injure him. *Id.* **at ¶ 22.**

29.     Officer Garcia then told Plaintiff that if she did not identify herself, he would place her under arrest for *Concealing identity*. Officer Garcia told Plaintiff this because he hoped that by threatening to arrest her, she would identify herself. *Id.* **at ¶ 23.**

30.     Plaintiff still refused to identify herself. The officers made the decision to arrest her. **Exhibit A at ¶¶ 42-44; Exhibit B at ¶ 23.**

31.     Officer Garcia's decision to arrest Plaintiff was based upon *Assault* or *Battery* for attempting to strike the person who tried to take her pulse; *Assault upon a peace officer* and *Battery upon a peace officer* for Plaintiff's attempt to break his fingers; Plaintiff's blocking pedestrian access to a public sidewalk; and *Concealing identity* for Plaintiff's refusal to identify herself. **Exhibit B at ¶ 24.**

32.     Officer Carrillo's decision to arrest Plaintiff was based on *Battery*, which occurred when Plaintiff grabbed the EMT's arm while he was giving her a sternum rub and shoving it away from her; for *Disorderly conduct* due to the fact that Plaintiff was intermittently yelling during the entire period of this incident, which caused a crowd to gather; for *Concealing identity* due to the fact that the officers had a legitimate reason to request Plaintiff's identity; and for lying across the sidewalk, preventing pedestrians from using it without stepping over her. **Exhibit A at ¶ 45.**

33.     Officer Garcia grasped Plaintiff's arm and attempted to turn her onto her stomach so that he could handcuff her. He succeeded in handcuffing one hand. **Exhibit B at ¶ 25.**

34.     Plaintiff actively resisted and thrashed about. *Id.* **at ¶ 25.**

35.     Plaintiff again grabbed Officer Garcia's fingers and bent them backwards and sideways against the joints. Officer Garcia concluded that Plaintiff was again attempting to break his fingers. *Id.* **at ¶ 25.**

36.     Plaintiff also grabbed Officer Carrillo's fingers and attempted to break them at the joints. **Exhibit A at ¶ 48.**

37.     Once Plaintiff was on her stomach, she placed the un-handcuffed arm underneath her body in order to make it difficult to handcuff her. **Exhibit B at ¶ 26.**

38.    Officer Garcia had to reach under Plaintiff's body and pry her arm out. *Id.* **at ¶ 26.**

39.    While this was occurring, a pin fell from Plaintiff's purse or clothing.  Plaintiff attempted repeatedly to use her free arm to reach for the pin, stating "Give it to me" over and over. *Id.* **at ¶ 27.**

40.    Officer Garcia was concerned that Plaintiff might attempt to use the pin as a weapon. He threw it out of her reach. *Id.* **at ¶ 28.**

41.    Plaintiff again attempted to grab Officer Garcia's fingers and bend them sideways and backwards. *Id.* **at ¶ 29.**

42.    After the officers succeeded in handcuffing Plaintiff, they attempted to place her in the patrol car.  However, Plaintiff was resisting so aggressively by holding her weight down and refusing to be moved that the officers were unable to do so.  **Exhibit A at ¶ 52; Exhibit B at ¶ 30; Exhibit F at ¶ 21.**

43.    Even though Plaintiff was handcuffed, she continued to attempt to bend Officer Garcia's fingers sideways and backwards as he was attempting to place her in the patrol car. **Exhibit B at ¶ 31.**

44.    Plaintiff repeatedly kicked backwards at the officers.  **Exhibit A at ¶ 53; Exhibit B at ¶ 31; Exhibit F at ¶ 20.**

45.    One kick struck Officer Garcia on his left upper thigh.  **Exhibit B at ¶ 31.**

46.    One of Plaintiff's kicks grazed Officer Carrillo's left shin.  **Exhibit A at ¶ 53.**

47.    The officers attempted to sit Plaintiff in the patrol car but she would not comply.  *Id.* **at ¶ 33.**

48.    Plaintiff pushed her feet against the doorframe, then pushed herself out of the vehicle. *Id.* **at ¶ 34.**

49.    The officers were unable to place Plaintiff in the patrol car working side-by-side. Officer Carrillo therefore went to the other side of the car and pulled Plaintiff in.  **Exhibit A at ¶ 54; Exhibit F at ¶ 21.**

50.    Plaintiff herself admits that she was resisting the officers when being placed in the patrol car.  **Exhibit I at p. 7, lines 11-14 and p. 9, lines 6-13.**

51. Plaintiff has no memory of the events prior to being placed in the patrol car. **First Amended Complaint at ¶ 30; Exhibit H at p. 18, lines 12-25; page 19, lines 9-15; page 26, lines 21 to 23; page 27, lines 7-10; p. 28, lines 3-12; Exhibit I at p. 4, lines 22-25; p. 5, lines 9-18; p. 8, line 25 to p. 9, line 11; p. 14, lines 21-24.**

52. Once Plaintiff was in the patrol car, Officer Garcia told the ambulance personnel that it was O.K. to treat Plaintiff if they felt they could safely do so. **Exhibit B at ¶¶ 35-36.**

53. The ambulance personnel refused to treat Plaintiff. *Id.* **at ¶ 37.**

54. Officer Carrillo took Plaintiff to the Police Station. **Exhibit A at ¶ 55.**

55. Officer Garcia looked through Plaintiff's purse for medications or anything else which would indicate that she had a medical problem. Officer Garcia did not find any medication or anything else related to a medical condition. **Exhibit B at ¶ 38.**

56. Officer Garcia found an identification card in Plaintiff's purse. He went to the address on Plaintiff's identification card in order to attempt to find a relative. He hoped that by contacting a relative, the relative could shed light on what Plaintiff's condition was. *Id.* **at ¶ 40.**

57. Detective Kacee Thatcher arrived on the scene. She also went to Plaintiff's home. **Affidavit of Kacee Thatcher, attached hereto as Exhibit J at ¶¶ 2-6.**

58. The officers found Plaintiff's 12 year old daughter, Regina, at the home. *Id.* **at ¶ 7.**

59. Detective Thatcher asked Regina if her mother had any medical conditions. Regina replied that her mother is epileptic and suffers seizures about four times per month. She also stated that her mother pushes people away if approached within 20 minutes of the end of a seizure. *Id.* **at ¶¶ 8-10.**

60. En route to the Police Department, Detective Thatcher contacted Plaintiff's ex-husband. He confirmed that Plaintiff suffers from epilepsy and has frequent seizures. Detective Thatcher relayed the information regarding Plaintiff's epilepsy to the other officers. *Id.* **at ¶¶ 12-14.**

61. Because the officers determined that Plaintiff's conduct may have been related to a seizure, Plaintiff was not charged with a crime. She was immediately released from custody once the officers made the determination that her conduct may have been seizure related. **Exhibit B at ¶ 44; Exhibit J at ¶ 17.**

62.     Plaintiff was released from custody at approximately 5:45 p.m. **Exhibit A at ¶ 58.**

63.     Kristen Andersen is the Emergency Medical Services Battalion Chief of the Fire Department and has been since January 2009. **Exhibit G at ¶ 5.**

64.     Ms. Andersen has observed and/or treated hundreds of patients who have undergone seizures. *Id.* **at ¶ 15.**

65.     The postictal phase of a seizure is the portion of a seizure when a patient is emerging from the seizure and follows the tonic-clonic (formerly grand mal) phase. *Id.* **at ¶ 17.**

66.     Ms. Andersen describes a person emerging from a tonic-clonic seizure as generally acting subdued, sedated and disoriented and not lucid. *Id.* **at ¶¶ 16 and 19.**

67.     Ms. Andersen has never seen a person who is in the postictal phase of a tonic-clonic seizure behave aggressively, violently, shout or use profanity. *Id.* **at ¶ 18.**

68.     Michael Daniels is a firefighter/EMT who witnessed the incident. In his employment as a firefighter, he regularly sees people emerging from a seizure. **Exhibit F at ¶¶ 2-3 and 25-26.**

69.     According to Mr. Daniels, Plaintiff did not appear to be having a seizure because she was oriented and fighting with the police officers. *Id.* **at ¶ 27.**

70.     Michael Hall is also a firefighter and EMT who witnessed the incident. **Exhibit D at ¶¶ 2-3 and 7.**

71.     Mr. Hall feels that Plaintiff did not appear to be emerging from a seizure because she was too animated for someone who is emerging from a seizure. *Id.* **at ¶ 8.**

72.     Officer Carrillo is an epileptic. **Exhibit A at ¶ 14.**

73.     Officer Carrillo does not have any medical training. However, he characterizes himself as substantially more knowledgeable about epilepsy than other laymen. Because he was diagnosed as an epileptic, he became quite curious about the disease. He read at least three or four books devoted entirely to epilepsy. He asked the doctors who were treating him for epilepsy numerous questions about the disease. *Id.* **at ¶¶ 23-26.**

74.     Due to the fact that Officer Carrillo is himself an epileptic, he describes himself as sensitive to the problems experienced by epileptics. Officer Carrillo adds that he takes the problems experienced by epileptics into consideration when he deals with epileptics on the job. *Id.* **at ¶ 56.**

75.     As an officer with the LCPD, Officer Carrillo has had occasion to observe numerous seizures. *Id.* **at ¶ 27.**

76.     In this case, Officer Carrillo had no reason to believe that epilepsy played a role in Plaintiff's conduct. *Id.* **at ¶ 57.**

77.     It did not appear to Officer Carrillo that Plaintiff was coming out of a seizure. He bases this on the fact that people who are coming out of seizures are disoriented, inarticulate and not aggressive. He has never seen anyone come out of a seizure act like Plaintiff. He describes Plaintiff as quite oriented toward her surroundings, very articulate and extremely aggressive. *Id.* **at ¶¶ 28-29.**

78.     Officer Garcia has taken a 40 hour course in dealing with persons who are mentally ill or have other types of emotional problems. **Exhibit B at ¶ 45.**

79.     Plaintiff's behavior did not fit in with anything Officer Garcia learned in the course. *Id.* **at ¶ 46.**

80.     Officer Garcia has witnessed at least three seizures prior to this incident. Based on those incidents, he did not notice any symptoms of seizure in Plaintiff. *Id.* **at ¶ 47.**

81.     On June 18, 2007, Officer Sepulveda was on patrol when he noticed a woman, later identified as Plaintiff, lying in the pedestrian path on Triviz Drive. *See***, Affidavit of Sepulveda, attached hereto as Exhibit K at ¶¶ 2-3.**

82.     Several passersby had stopped. One of them told Officer Sepulveda that he or she had seen Plaintiff fall backwards. *Id.* **at ¶ 5.**

83.     Concerned that Plaintiff might have some sort of medical problem, Officer Sepulveda radioed Central Dispatch, requesting the Fire Department and a private ambulance company. *Id.* **at ¶¶ 6-7.**

84.     American Medical Response, a private ambulance company, and Officer Torres arrived in response to Officer Sepulveda's call. **Exhibit K at ¶ 8; Affidavit of Torres, attached hereto as Exhibit L at ¶¶ 3-4.**

85.     Plaintiff appeared rigid and was unresponsive to questions posed by the EMTS. **Exhibit L at ¶¶ 6 and 9.**

86.     A passerby also told Officer Torres that Plaintiff appeared to have had a seizure, then fell backward. *Id.* **at ¶ 8.**

87.     Officer Sepulveda approached Plaintiff.  He described her as trembling as though she were having a seizure.  Her eyes were closed.  Eventually her eyes opened.  Officer Sepulveda attempted to speak with Plaintiff but got no response.  **Exhibit K at ¶ 9.**

88.     According to Officer Sepulveda, Plaintiff sat up, then stood very abruptly.  Plaintiff's behavior struck Officer Sepulveda as extremely unusual.  This is because she appeared to sit up, then stand up all in one movement.  *Id.* **at ¶ 10.**

89.     Officer Torres describes Plaintiff as getting up off the ground all of a sudden.  He adds that when she got up, she got up quite stiffly and looked very disoriented.  She did not speak or respond to questions.  There was no transition from what appeared to be unconsciousness to her getting up.  **Exhibit L at ¶ 9.**

90.     Plaintiff began walking away.  Officer Sepulveda went up to her and said "Hold on a second."  He said this because he was not familiar with Plaintiff's condition and wanted one of the EMTs to take a look at her before she left.  **Exhibit K at ¶ 11.**

91.     Officer Torres became concerned because Plaintiff began walking toward Triviz Drive.  It is only a short distance from the pedestrian path to Triviz Drive.  Officer Torres was afraid that Plaintiff would walk into Triviz Drive and get struck by a vehicle.  **Exhibit L at ¶ 10.**

92.     Plaintiff became upset that the officers were attempting to stop her.  She indicated that she did not want medical attention.  **Exhibit K at ¶ 12.**

93.     Officer Sepulveda stopped Plaintiff from walking away by blocking her path.  *Id.* **at ¶ 13.**

94.     In order to prevent Plaintiff from getting struck by a vehicle, Officer Torres grabbed one of her arms while Officer Sepulveda grabbed the other.  In response, Plaintiff attempted to pull away from the officers.  **Exhibit L at ¶ 11.**

95.     Officer Torres told Plaintiff "I am not going to let you go.  This is for your own safety.  I need to find out what happened.  I won't release you until you are medically cleared."

Officer Torres said these things because he wanted to err on the side of caution by not letting Plaintiff wander away if she were not alert and oriented. *Id.* at ¶ 12.

96.     Plaintiff was non-responsive to Officer Torres' statements and became combative. *Id.* at ¶¶ 13-14.

97.     Plaintiff continued to struggle.  Officer Torres felt that Plaintiff was going to attempt to cross Triviz Drive again.  He remained concerned that she might get struck by a vehicle. *Id.* at ¶ 15.

98.     Plaintiff continued to pull away from both officers and continued to attempt to cross Triviz Drive.  Officer Torres made the decision to handcuff Plaintiff.  He handcuffed Plaintiff because he did not wish Plaintiff to hurt herself.  By that, Officer Torres means that Plaintiff was placing the officers in a situation where they would have to use some sort of force to restrain her and he felt that handcuffing Plaintiff was the least severe use of force appropriate to the situation. *Id.* at ¶ 16.

99.     Initially the officers intended to detain Plaintiff only long enough to ensure that she was alert and oriented.  However, when Plaintiff continued to be non-responsive to the questions of the EMTs, the EMTs and the officers felt that the safest course of action was to take Plaintiff to the hospital.  **Exhibit K at ¶ 14; Exhibit L at ¶ 17.**

100.     The EMTs attempted to grasp Plaintiff so they could place her in the ambulance but Plaintiff became combative with the EMTs.  **Exhibit K at ¶ 15.**

101.     In response, the officers helped place Plaintiff in the ambulance. *Id.* at ¶ 18.

102.     The EMTs strapped Plaintiff to the gurney and evacuated her to hospital.  **Exhibit K at ¶ 19; Exhibit L at ¶ 19.**

## IV.   Argument

### A.     The Qualified Immunity Standard.

Plaintiff makes claims against the officers under 42 U.S.C. § 1983.  As to these claims, the officers assert the defense of qualified immunity.  When a claim of qualified immunity is raised by a defendant on summary judgment, the court must ascertain whether plaintiff has sufficiently asserted the violation of a constitutional right and whether plaintiff's allegations, if true, state a claim for a

violation of a constitutional right that was clearly established when defendant acted. *Romero v. Fay*, 45 F.3d 1472, 1475 (10th Cir. 1995).

The Supreme Court has decided that it is not necessary for a court to consider these elements in any particular order. *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 818, 172 L. Ed. 2d 565 (2009). In other words, if a court feels it would be more expedient to decide whether a government actor has violated clearly established law as opposed to first inquiring as to whether the act in question was unconstitutional, the court may do so. *Id.*

In contrast to a typical motion for summary judgment, a summary judgment motion based on qualified immunity imposes the burden of proof on the plaintiff. *Camuglia v. City of Albuquerque*, 448 F.3d 1214, 1218 (10th Cir. 2006). In order to carry his burden, plaintiff must do more than identify in the abstract a clearly established right and allege that defendant has violated it. *Romero*, 45 F.3d at 1475. Rather, plaintiff must articulate a clearly established constitutional right and explain how defendant's conduct violated the right with specificity. *Id.* Plaintiff must also demonstrate a substantial correspondence between the conduct in question and prior law, establishing that defendant's actions were clearly prohibited. *Id.* Unless such a showing is made, defendant prevails. *Id.*

The Supreme Court has recognized that when officials act in ways they reasonably believe to be lawful, they should not be held personally liable. *Anderson v. Creighton*, 483 U.S. 635, 641, 107 S. Ct. 3034, 3039-3040, 97 L. Ed. 2d 523 (1987). The relevant question is whether a reasonable officer could have believed that his conduct was lawful, in light of clearly established law and the information the officer possessed at the time. *Id.*, 483 U.S. at 641, 197 S. Ct. at 3040. The qualified immunity standard ". . . provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096, 89 L. Ed. 2d 271 (1986).

**B.      The Officers are Entitled to Qualified Immunity as to the First Incident.**

**1.      The Officers are Entitled to Summary Judgment as to the False Arrest, False Imprisonment and Unreasonable Seizure Claims Because the Officers Had Probable Cause to Arrest Plaintiff.**

Count II of the Complaint makes a claim for false arrest; Count III a claim for false imprisonment; and Count V a claim for unreasonable search and seizure.  It should be mentioned that the first two claims are really state law torts, which are subsumed by Fourth Amendment unreasonable seizure.  The state tort of false arrest concerns the period from arrest until some unknown point prior to trial, whereas false imprisonment applies after that point.  *Mondragon v. Thompson*, 519 F.3d 1078, 1082 (10th Cir. 2008); *Pierce v. Gilchrist*, 359 F.3d 1279, 1285-1286 (10th Cir. 2004).  Because these state law torts are another way of alleging unreasonable seizure, the three claims will be dealt with together.

We begin with the rule that "[a] police officer may arrest a person without a warrant if he has probable cause to believe that person committed a crime."  *Romero,* 45 F.3d at 1476, *citing Tennessee v. Garner*, 471 U.S. 1, 6-8, 105 S. Ct. 1694, 1699, 85 L. Ed. 2d 1 (1985).  "'Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense.'"  *Id., citing Jones v. City and County of Denver*, 854 F.2d 1206, 1210 (10th Cir. 1988); *Gerstein v. Pugh*, 420 U.S. 103, 111-112, 95 S. Ct. 854, 861-862, 43 L. Ed. 2d 54 (1975); *Beck v. Ohio*, 379 U.S. 89, 91, 85 S. Ct. 223, 225, 13 L. Ed. 2d 142 (1964).  "When a warrantless arrest is the subject of a § 1983 action, the defendant arresting officer is 'entitled to immunity if a reasonable officer could have believed that probable cause existed to arrest' the plaintiff."  *Id., citing Hunter v. Bryant*, 502 U.S. 224, 228, 112 S. Ct. 534, 537, 116 L. Ed. 2d 589 (1991); *Anderson*, 483 U.S. at 641, 107 S. Ct. at 3039.  The fact that it later turns out that the plaintiff did not commit the crime for which he was arrested is irrelevant.  "Even law enforcement officials who 'reasonably but mistakenly conclude that probable cause is present' are entitled to immunity."  *Hunter,* 502 U.S. at 227, 112 S. Ct. at 536; *Romero,* 43 F.3d at 1476.  In order to overcome qualified immunity, the plaintiff must show that the officer who arrested him knowingly or recklessly relied on incorrect information.  *Taylor v. Meacham*, 82 F. 3d 1556, 1563 (10th Cir. 1996).  Negligence or inadvertence will not suffice.  *Id.*

13

Given that probable cause negates liability on the part of a police officer for an allegation of unreasonable seizure, the task before us is to determine whether the officers had probable cause to arrest Plaintiff.

The first incident began when Officer Carrillo responded to a call referencing a woman lying on a sidewalk.  He arrived and found Plaintiff lying across the sidewalk in such a position that pedestrians would have to step over her in order to use the sidewalk.  Plaintiff was periodically yelling, causing neighbors to gather.  Officer Carrillo saw a neighbor approach Plaintiff and touch her shoulder.  Plaintiff yelled "Get away from me."

Officer Carrillo attempted to speak with Plaintiff.  In response, she made statements such as "Leave me alone" and "Don't touch me."  Fire Department personnel and ambulance company personnel had also arrived.  Fire Department personnel described Plaintiff variously as abusive, disorderly, yelling at those around her, combative, aggressive and uncooperative.  However, they never treated Plaintiff because the ambulance company assumed patient care.

An EMT attempted to give Plaintiff a sternum rub (a medical procedure).  In response, Plaintiff grabbed the EMT's hand and threw it back.  She used profanity and stated "don't touch me." An EMT also attempted to take Plaintiff's pulse.  In response, Plaintiff cocked her arm back, clenched her fist and attempted to administer a backhand blow to the EMT.

The EMTs made the determination that they were unable to treat Plaintiff due to her being extremely combative.  They requested the help of the police.  It should be noted that EMTs do not treat patients who are violent or disruptive.  Where patients are violent or disruptive, it is standard procedure for a police officer to ensure the safety of the EMTs before the EMTs provide assessment or treatment.

In response to the EMT's request, Officer Carrillo attempted to speak with Plaintiff.  Officer Carrillo explained to Plaintiff that they were there to help her, to make sure that she was okay and that they needed to get her name and address so they could contact her family.

At this point, one of the neighbors on the scene mentioned that she believed that Plaintiff had a history of seizures.  The neighbor indicated that she knew where Plaintiff lived.  Officer Carrillo asked the neighbor to visit Plaintiff's home in an attempt to make contact with a family member.

14

Officer Carrillo did not attempt to do this himself because he did not wish to leave the scene.  In a situation where a patient is violent or non-cooperative, it is the duty of a police officer to secure the scene so that the EMTs may safely treat the patient.  The neighbor returned and indicated that no one was home.

Officer Garcia then arrived.  Officer Garcia approached Plaintiff.  He told her "we were called out because we were concerned.  These people are here to help you.  I am here to make sure they are O.K. and you are O.K." or words to that effect.  Officer Garcia further told Plaintiff "If you are lying on the floor (sic) because you want to, that's okay.  We will go" or similar words.  In response, Plaintiff yelled at Officer Garcia.

While it occurred to the officers that Plaintiff might be suffering from some sort of medical condition, she was not wearing a bracelet, a medallion on her neck or any other indicator that she suffered from a disease.  Officer Garcia decided to look through Plaintiff's purse.  He wished to search for medications which would give him a clue as to whether Plaintiff suffered from a medical condition. He also wished to obtain her identification so he could contact a family member.  Often when the police obtain the identification of a person suffering from a medical condition, the Police Department's computerized record system will provide the name of a relative.  The police can then contact the relative and inquire about the person's medical history.  This allows the officer to make the proper decision as to what to do with the subject.

Officer Garcia first told Plaintiff that he was going to get her purse.  As he began to pick up the purse, Plaintiff pulled it away.  She stated "Let go of my purse, motherfucker."  Plaintiff then grabbed Officer Garcia's fingers.  She tried to twist and break his fingers by bending them backwards and sideways at the joints, causing Officer Garcia considerable pain.  Officer Garcia describes Plaintiff as coherent when she was attempting to break his fingers.  He asked her "What is wrong with you?  If you want to lay here, you can do it."  He explained to Plaintiff that if she would just answer a few medical questions, they would leave her alone.

Up to this point, Officer Garcia was concerned that Plaintiff may have been experiencing some sort of medical problem.  However, he became convinced that Plaintiff's conduct was not related to a medical condition due to the fact that she was using profanity, acting extremely

aggressively and attempting to injure him.  Officer Garcia then told Plaintiff that if she did not identify herself, he would place her under arrest for *Concealing identity*.  Officer Garcia told Plaintiff this because he hoped that by threatening her with arrest, she would identify herself, answer medical questions or explain her condition.  Plaintiff still refused to identify herself.  At this point, the officers made the decision to arrest her.

When the officers made the decision to arrest Plaintiff, they had probable cause that she had committed numerous crimes.  This incident began with Plaintiff lying across the sidewalk in such a position that pedestrians would have to step over her in order to use the sidewalk.  This violates Las Cruces Municipal Code, specifically LCMC 1997, § 19-90; *Obstructing movement*.[2]  In addition, Plaintiff was shouting repeatedly, which caused a crowd to gather, in violation of NMSA 1978, § 30-20-1; *Disorderly conduct* and LCMC 1997, § 19-126; *Yelling or shouting*.

When the EMTs arrived, one attempted to give Plaintiff a sternum rub.  In response, Plaintiff grabbed the EMT's hand and threw it back.  An EMT also attempted to take Plaintiff's pulse.  In response to this, Plaintiff cocked her arm back, clenched her fist and attempted to administer a blow to the EMT.  Both of these actions violate NMSA 1978, § 30-3-1; *Assault*.  In addition, when Plaintiff grabbed the hand of the EMT attempting to give her a sternum rub and threw it back, Plaintiff committed *Battery* (NMSA 1978, § 30-3-4).

Unable to identify Plaintiff, Officer Garcia informed her that he was going to look through her purse.  In response, Plaintiff grabbed Officer Garcia's fingers.  She twisted them backwards and sideways at the joints, causing Officer Garcia considerable pain.  Officer Garcia concluded that Plaintiff was attempting to break his fingers.  This violates NMSA 1978, § 30-22-21; *Assault upon a peace officer* and NMSA 1978, § 30-22-24; *Battery upon a peace officer*.  Significantly, *Battery upon a peace officer* is a felony.  NMSA 1978, § 30-22-24(B).

Throughout her contact with the police officers, Plaintiff's conduct was in violation of NMSA 1978, § 30-22-1; *Resisting, evading or obstructing an officer*.

---

[2] For the Court's convenience, all ordinances and statutes cited are attached hereto as Exhibit M.

After Plaintiff had committed a variety of crimes, the officers demanded Plaintiff's identification, which she refused to provide.  This violates NMSA 1978, § 30-22-3; *Concealing identity*.

As *Hunter* and *Romero* make clear, even officers who reasonably but mistakenly believe probable cause exists are entitled to qualified immunity.  Given that the officers had probable cause to believe that Plaintiff committed multiple crimes, including a felony *(Battery upon a peace officer)*, Plaintiff cannot credibly argue that the officers arrested her without probable cause.  This is particularly true given that the officers were the victims of – not just the witnesses to – some of these crimes.

Later it emerged that Plaintiff is an epileptic and that her behavior towards the police was probably the result of a seizure.  Plaintiff will no doubt argue that the police officers lacked probable cause to arrest her because they should have known that her conduct was unintentional.  Plaintiff's (presumed) criticism is misplaced.  Under the circumstances there was nothing to alert a reasonable officer that Plaintiff's acting out was, indeed, the after-effects of a seizure.

Plaintiff apparently has an extremely rare condition in which a person suffering from a tonic-clonic (formerly grand mal) seizure becomes combative in what is termed the postictal phase (that is, when the person is emerging from the seizure).  Kristen Andersen is probably one of the most knowledgeable persons about the provision of emergency medical services in the City.  She is head of Emergency Medical Services at the Fire Department.  Ms. Andersen has observed or treated hundreds of patients who have undergone seizures.  She describes people emerging from a tonic-clonic seizure as generally acting subdued, sedated and disoriented.  They certainly do not behave aggressively, violently, shout or use profanity, as Plaintiff did.

Michael Daniels and Michael Hall, two Firefighter/EMTs who observed the incident, also characterize Plaintiff's behavior as completely at odds with the typical person emerging from a seizure.  They describe Plaintiff's demeanor as being oriented, combative and animated – all inconsistent with the characteristics of emergence from a seizure.

We are fortunate that the primary officer involved in this incident, Officer Carrillo, is himself an epileptic.  Although Officer Carrillo does not claim any expertise in medicine, he characterizes

17

himself as substantially more knowledgeable about epilepsy than other laymen. Because he was diagnosed as an epileptic, he became curious about the disease. Officer Carrillo has read at least three or four books devoted entirely to epilepsy. He asked the doctors who were treating him for epilepsy numerous questions about the disease. Due to the fact that Officer Carrillo is himself an epileptic, he describes himself as sensitive to the problems experienced by epileptics. He takes the problems experienced by epileptics into consideration when he deals with epileptics on the job. Nonetheless, Officer Carrillo had no reason to believe that epilepsy played a role in Plaintiff's conduct. It did not appear to Officer Carrillo that Plaintiff was emerging from a seizure. He describes persons emerging from a seizure as disoriented, inarticulate and not aggressive. He has never seen anyone coming out of a seizure behave like Plaintiff.

Officer Garcia's experience with epilepsy is somewhat less than that of Officer Carrillo. Officer Garcia has taken a 40 hour course in dealing with the mentally ill and had witnessed several seizures prior to this incident. However, Plaintiff's behavior did not fit into anything Officer Garcia had learned in the course or in the field.

Likewise, Plaintiff was not wearing a bracelet, a medallion on her neck or any other insignia informing the public that she suffered from epilepsy.

What we have, then, is a person who suffers from an extremely rare condition which causes her to become violent and aggressive when emerging from seizure. All concerned have testified that Plaintiff's demeanor – in which she was both aggressive and lucid – is completely at odds with typical behavior during a seizure.

Essentially, what Plaintiff asks is that the police officers diagnose an extremely obscure condition which, one supposes, even a neurologist would have trouble diagnosing. Further, Plaintiff asks that the officers diagnose her obscure condition despite the fact that its symptoms are that Plaintiff is lucid and violent. The problem is that a person who is lucid and violent during the postictal phase of a seizure bears a striking resemblance to a person who is merely lucid and violent. Plaintiff simply asks too much of the officers.

Plaintiff may argue that it should have been obvious that her condition had, at a minimum, mental health overtones. But a suggestion of mental problems coupled with Plaintiff's lucid state

failed to put the officers on notice that Plaintiff's actions were involuntary, which is really the issue here.

To the extent that Plaintiff's claim for unreasonable seizure extends beyond the arrest itself to the brief period she was detained after being arrested, it should be noted the police officers did not simply arrest Plaintiff then wash their hands of the matter. After Plaintiff was arrested, Officer Garcia looked through her purse for medications or anything else which would indicate that she had a medical problem. Finding nothing, Officer Garcia obtained Plaintiff's address from her identification card. He and a detective went to Plaintiff's home in an attempt to find a relative. Their goal in contacting a relative was to shed light on what Plaintiff's condition was. Officer Garcia and the detective visited Plaintiff's home where they encountered Plaintiff's twelve year old daughter, Regina. Regina indicated that Plaintiff is an epileptic, suffers seizures about four times a month and pushes people away if approached within 20 minutes after the end of a seizure. En route to the Police Department, the detective contacted Plaintiff's ex-husband. He confirmed that Plaintiff suffers from epilepsy and has frequent seizures. Because the officers determined that Plaintiff's conduct may have been related to her emergence from a seizure, she was not charged with a crime. She was immediately released from custody once the officers made the determination that her behavior was apparently involuntary.

In assessing Plaintiff's claim for unreasonable seizure, it is helpful to paint a picture of how quickly the officers acted. Officer Carrillo was the first officer on the scene. He arrived at 4:22 p.m. The officers and EMTs spent quite some time attempting to communicate with Plaintiff prior to her arrest. Nonetheless, Plaintiff was released from custody at approximately 5:45 p.m. In other words, from Officer Carrillo's arrival at the scene to Plaintiff's release, only about one hour and twenty-three minutes elapsed. Given the short period of time that elapsed, there is objective evidence that once the officers made the decision to arrest Plaintiff, they also acted quickly to rule out a medical or mental health issue. Unable to rule those issues out, they immediately released Plaintiff. Just as the presence of probable cause negated any claim for unreasonable seizure Plaintiff may have had in relation to her arrest, the officers' quick action to release Plaintiff as soon as the possible

involuntariness of her conduct was confirmed negates any unreasonable seizure after Plaintiff's arrest.

**2.    The Court Should Grant the Officers Summary Judgment as to Plaintiff's Excessive Force Claims Because the Amount of Force the Officers Used Was Reasonable.**

Count I of the complaint makes a claim for *Excessive force*.  The use of *Excessive force* in making an arrest constitutes an unreasonable seizure in violation of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 394, 109 S. Ct. 1865, 1871, 104 L. Ed. 2d 443 (1989).  In assessing an officer's justification for the use of force, the Court must place itself in the shoes of a reasonable officer at the scene, rather than award itself the benefit of 20/20 hindsight.  *Id.*, 490 U.S. at 396, 109 S. Ct. at 1872.  The *Graham* court held that all claims that law enforcement officers have used excessive force have to be judged from the standpoint of objective reasonableness.  The court identified three factors which should be taken into consideration in assessing this:  1) the severity of the crime at issue; 2) whether the suspect poses an immediate threat to the safety of the officers or others; and 3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. 490 U.S. at 396, 109 S. Ct. 1872.

Applying *Graham* to the case at bar, it emerges that the officers' conduct was objectively reasonable.  When the officers made the decision to arrest Plaintiff, she was lying on her back. Officer Garcia attempted to turn Plaintiff onto her stomach so that he could handcuff her.  However, he succeeded in handcuffing only one hand because Plaintiff actively resisted and thrashed about. Plaintiff grabbed Officer Garcia's fingers and bent them backwards and sideways against the joints. Officer Garcia concluded that Plaintiff was trying to break his fingers.  Officer Carrillo attempted to handcuff Plaintiff and met the same fate.  Plaintiff also grabbed Officer Carrillo's fingers and attempted to break them at the joints.

After the officers succeeded in turning Plaintiff on her stomach, Plaintiff placed her un-handcuffed arm underneath her body in order to make it difficult for the officers to handcuff it. Officer Garcia had to reach under Plaintiff's body and pry her arm out.  As this was occurring, a pin fell from Plaintiff's purse or clothing.  Plaintiff tried repeatedly to use her free arm to reach for the

pin, stating "Give it to me" over and over. Officer Garcia was understandably concerned that Plaintiff might attempt to use the pin as a weapon. He threw it out of her reach.

Plaintiff again grabbed Officer Garcia's fingers and bent them sideways and backwards. Eventually, however, the officers succeeded in handcuffing Plaintiff. They then attempted to place Plaintiff in the patrol car. However, she was resisting so aggressively that the officers were unable to do so. Plaintiff resisted by holding her weight down and refusing to be moved. In addition, even though Plaintiff was handcuffed, she continued to bend Officer Garcia's fingers sideways and backwards as he was attempting to place her in the patrol car. Further, Plaintiff repeatedly kicked backward at the officers. One kick struck Officer Garcia. Another kick struck Officer Carrillo.

The officers attempted to sit Plaintiff in the patrol car. However, she pushed her feet against the doorframe and pushed herself out of the vehicle. Unable to place Plaintiff in the patrol car working side by side, Officer Carrillo went to the other side of the car and pulled Plaintiff in. Critically, Plaintiff herself admits that she was resisting the officers when being placed in the patrol car.

Once Plaintiff was in the patrol car, Officer Garcia informed the ambulance personnel that they could treat Plaintiff. The ambulance personnel refused to do so. This is a violation of protocol in that the EMTs responsible for patient care must assess the patient or, if they cannot, must transport the patient to hospital against his or her will.

Other than the EMTs' refusal to treat Plaintiff, there was nothing terribly unusual about her arrest. Plaintiff resisted arrest fiercely. In response, the officers exercised restraint, despite what must have been a great deal of frustration on their part. Applying the three factors the *Graham* court held should be taken into consideration in assessing whether a use of force is objectively reasonable, it emerges that all three factors resolve themselves in favor of the officers.

The first factor is the severity of the crime at issue. Although the majority of crimes that Plaintiff committed up to the officers' decision to arrest her were misdemeanors, one, *Battery upon a peace officer*, is a felony. This occurred when Plaintiff attempted to break Officer Garcia's fingers. However, as the arrest progressed, Plaintiff committed this crime repeatedly. Plaintiff grabbed both officers' fingers and attempted to break them during the arrest itself. Further, she kicked both

21

officers. Thus, in addition to the single felony committed prior to the decision to arrest her, Plaintiff committed numerous counts of *Battery upon a peace officer* as the officers attempted to arrest her.

The second factor is whether the suspect poses an immediate threat to the safety of the officers or others. Here, the EMTs felt that it was necessary to examine Plaintiff rather than allow her to remain on the sidewalk. However, when they attempted to do so, Plaintiff struck or attempted to strike them on two occasions. Unable to examine Plaintiff, the EMTs requested the police officers' help. Wishing to ascertain Plaintiff's identity and to determine if she carried medication, Officer Garcia informed her that he was going to look through her purse. Plaintiff then attacked Officer Garcia, attempting to break his fingers. Taking into consideration that the EMTs felt it was necessary to examine Plaintiff, that she refused to let them do so and that she attacked the EMTs and the police officers when they attempted to help her, it is undisputed that Plaintiff posed an immediate threat to the safety of the officers or others.

In addition, Plaintiff's conduct after the officers informed her that they were going to arrest her hardly dispels one's impression that Plaintiff posed a danger to the safety of the officers. During her arrest, she repeatedly attacked both officers by attempting to break their fingers and by kicking them. In addition, one assumes Plaintiff was attempting to grasp the pin that had fallen on the ground in order to use it to stab Officer Garcia.

Finally, in assessing whether the police officers' use of force was objectively reasonable, the Court must examine whether Plaintiff was actively resisting arrest or attempting to evade arrest by flight. Plaintiff resisted vigorously since the inception of her arrest. When Officer Garcia first attempted to turn Plaintiff over so that he could handcuff her, Plaintiff began thrashing about. She placed her un-handcuffed arm underneath her body in order to make it more difficult for the officers to handcuff her. Plaintiff again attempted to break both officers' fingers. As the officers attempted to place Plaintiff in the patrol car, she was resisting so fiercely that they were unable to do so. This included both holding her weight down so she could not be moved and kicking both officers. The officers succeeded in placing Plaintiff in the patrol car only to have her exit the patrol car again by pushing against the doorframe. Finally, the officers were able to get Plaintiff into the car by having one officer pull Plaintiff in from one side while the other pushed her in from the other side. In

addition, as stated above, Plaintiff herself admits that she was resisting the officers while being placed in the patrol car.

Thus, all three of the *Graham* factors employed in determining whether a use of force was objectively reasonable have been met. Plaintiff's conduct justified using force. The amount of the force the officers used was not only reasonable but their behavior evinced a great deal of patience given Plaintiff's conduct. The Court should therefore grant the Defendants summary judgment as to Plaintiff's excessive force claim.

### 3.     The Court Should Grant the Officers Summary Judgment as to Plaintiff's Equal Protection Claim Because They Did Not Discriminate Against Plaintiff.

Count IV of the complaint makes a claim for equal protection violations. "The equal protection clause is triggered when the government treats someone differently than another who is similarly situated." *Buckley Construction, Inc. v. Shawnee Civic & Cultural Development Authority*, 933 F.3d 853, 859 (10th Cir. 1991). "But not every denial of a right conferred by state law involves a denial of the equal protection of the laws . . ." *Snowden v. Hughes*, 321 U.S. 1, 8, 64 S. Ct. 397, 401, 88 L. Ed. 497 (1944). Rather, as the *Snowden* court stated:

> …[W]here the official action purports to be in conformity to the statutory classification, an erroneous or mistaken performance of the statutory duty, although a violation of the statute, is not without more a denial of the equal protection of the laws.
>
> The unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination. *Id.*

It is the Plaintiff's burden to show that there is intentional discrimination. ". . . [A] discriminatory purpose is not presumed; there must be a showing of clear and intentional discrimination." *Id.* (citations omitted).

Assuming that the Court agrees that the officers had probable cause to arrest Plaintiff and used a reasonable amount of force in effecting that arrest, there can be no equal protection violation. If the police acted constitutionally, the claim must fail.

Even if the officers lacked probable cause to arrest Plaintiff and used excessive force in effecting that arrest, which is specifically denied, Plaintiff's equal protection claim would still fail.

Plaintiff's whole case revolves around her allegations that she was in the midst of a seizure, she is an epileptic and the officers failed to realize this. She cannot now claim that she was being discriminated against by the officers because she is an epileptic. Plaintiff cannot have it both ways: Either the officers knew she was an epileptic or they did not.

Further, as stated above, Plaintiff cannot show clear and intentional discrimination – a necessary element for an equal protection claim. Even if the officers knew Plaintiff was an epileptic, she cannot demonstrate that her epilepsy was the basis for the officers' conduct. Plaintiff's equal protection claim should also be dismissed upon summary judgment.

### 4.    The Court Should Grant the Officers Summary Judgment as to Plaintiff's "Arbitrariness" Claim Because the Officers Did Not Invade a Protected Interest.

Count VI of the complaint makes a complaint for "arbitrariness." Even if there is no constitutional violation, government conduct can become so extreme as to be arbitrary and capricious. *See, e.g., Weathers v. West Yuma County School District R-J-1*, 530 F.2d 1335, 1340 (10th Cir. 1976). The problem, however, is absent a constitutional violation, "arbitrariness" is not actionable. If the Court determines that the officers are entitled to qualified immunity as to the other claims, no liberty or property interest has been violated. If no liberty or property interest has been violated, there is no constitutional violation. *Id.* The officers are therefore entitled to summary judgment as to the "arbitrariness" claim.

### C.    The Officers are Entitled to Qualified Immunity as to the Second Incident.

The second incident differs from the first in that there was never a suggestion of criminal activity. Rather, the officers acted purely in their community caretaker function. Officers may briefly detain persons for non-investigatory reasons under their community caretaker role. *Novitsky v. City of Aurora*, 491 F.3d 1244, 1253 (10th Cir. 2007). To do so, the detention must be 1) justified at its inception and 2) reasonably related in scope to the circumstances which justified the detention in the first place. *Id.*

The second incident began when police officers observed Plaintiff lying in the pedestrian path adjacent to Triviz Drive. Concerned that Plaintiff might be experiencing some sort of medical problem, Officer Sepulveda requested an ambulance. In response, Officer Torres and a private ambulance crew arrived.

24

Plaintiff appeared rigid and was unresponsive to questions posed by the EMTs. A passerby told Officer Torres that Plaintiff appeared to have had a seizure, then fell backward.

According to both officers Sepulveda and Torres, Plaintiff abruptly went from a prone position to a sitting position to standing up. She got up quite stiffly, looked disoriented and did not respond to questions. Plaintiff then began walking away.

Officer Sepulveda approached Plaintiff and stated "Hold on a second." He said this because he was not aware of what Plaintiff's medical condition was and wished to have her assessed by the EMTs. Officer Torres became worried because Plaintiff began walking towards Triviz Drive. Because Plaintiff had fallen on the nearby pedestrian path, it was only a short distance to Triviz Drive. Officer Torres was concerned that Plaintiff would enter Triviz Drive and get struck by a vehicle.

Officer Sepulveda stopped Plaintiff from walking away by blocking her path. In order to prevent Plaintiff from getting struck by a car, the officers each grabbed one of Plaintiff's arms. In response, Plaintiff attempted to pull away from the officers. Officer Torres told Plaintiff "I am not going to let you go. This is for your own safety. I need to find out what happened. I won't release you until you are medically cleared." Officer Torres said these things because he wanted to err on the side of caution by not letting Plaintiff wander away if she were not alert and oriented.

Plaintiff became combative. The officers felt that Plaintiff was going to attempt to cross Triviz Drive again. They remained concerned that she might get struck by a car. Plaintiff continued to pull away from both officers and attempted to cross Triviz Drive. At that point, Officer Torres made the decision to handcuff Plaintiff. He decided to handcuff Plaintiff because he figured that this was the least severe use of force that would be effective in restraining her.

The detention was justified by the two-part test enunciated in *Novitsky*. The detention of Plaintiff was justified at its inception due to the fact that Plaintiff was experiencing some sort of medical problem which may have resulted in her stepping into traffic and being struck by a vehicle. In addition, the detention was reasonably related in scope to the circumstances which justified it in the first place because the officers originally intended to detain Plaintiff only long enough to have her assessed by the EMTs.

However, Plaintiff continued to be non-responsive to questions posed by the EMTs. The EMTs made the decision that the safest course of action was to take Plaintiff to the hospital. The EMTs attempted to grasp Plaintiff so they could place her in the ambulance. Plaintiff became combative. As the EMTs were placing Plaintiff onto the gurney, the officers assisted them. This was the extent of the officers' contact with Plaintiff.

When the officers aided the EMTs in placing Plaintiff in the ambulance, their behavior was also constitutional. The government may seize a person for non-criminal purposes as long as there is probable cause that the subject has some medical or emotional ailment which requires seizure. *Pino v. Higgs*, 75 F.3d 1461, 1468 (10th Cir. 1996); *Anaya v. Crossroads Managed Care Systems*, 195 F.3d 584, 590 (10th Cir. 1999). These cases have held that the state has an interest in protecting the mentally ill from harming themselves (*Pino*, 75 F.3d at 1468) and from protecting intoxicated people from harming themselves (*Anaya*, 195 F.3d at 591).

In the present case, the officers acted to protect Plaintiff (who was presumably emerging from a seizure) from harming herself by aiding the EMTs in evacuating her by ambulance. Given Plaintiff's patently abnormal conduct and the danger she posed to herself, the officers' course of action was quite reasonable. The officers are therefore entitled to qualified immunity as to the second incident.

## V.  Conclusion

For the reasons set forth above, the Court should grant summary judgment to all officers on the basis of qualified immunity.

Respectfully submitted,

CITY OF LAS CRUCES

By:  /s/ Jared Abrams
       Jared Abrams
       Senior Assistant City Attorney
       P.O. Box 20000
       Las Cruces, NM  88004
       (575) 541-2128
       (575) 541-2017 Fax
       *Attorney for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing document was mailed in a properly addressed and stamped envelope by **Certified Mail, Return Receipt Requested**, on the 25th day of May, 2010 to:

Paul M. Gayle-Smith
Law Offices of Paul M. Gayle-Smith
2961 Sundance Circle
Las Cruces, NM  88011-4609
*Attorney for Plaintiff*

/s/ Jared Abrams
Jared Abrams
