## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

OLGA G. VENEGAS,

      Plaintiff,

  vs.

CHRISTOPHER CARRILLO, *et al.*,

      Defendants.

No. 11-CV-0448-MV-WPL

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

**THIS MATTER** comes before the Court on Plaintiff's Trial Brief and
Memorandum of Law [Doc. 109], Defendant's Trial Memorandum [Doc. 110],
Defendant's Revised Findings of Fact and Conclusions of Law [Doc. 132], and
Plaintiff's Proposed Post-Trial Findings of Fact and Conclusions of Law [Doc. 136].
The Court, having considered the briefs, relevant law, trial testimony, exhibits, and
being otherwise fully-informed, finds that judgment must be entered in favor of
Defendants on all Counts and that Plaintiff is not entitled to the relief requested.

## FINDINGS OF FACT

The Court is familiar with the facts of this case from extensive pretrial
motion practice, a four-day bench trial, and the exhaustive set of exhibits submitted
by the parties.  Both parties have also submitted proposed findings of fact.  *See
generally* Docs. 132, 136.  The Court has reviewed both sets of proposed facts and

accepts some of these facts, rejects some, and finds some facts that neither party brought to its attention.  Accordingly, the Court finds as follows:

## I.   The Initial Encounter

1.   During the afternoon of June 9, 2007, Defendant Christopher Carrillo, a licensed police officer employed by the City of Las Cruces, New Mexico responded to a call for a welfare check regarding a woman lying on a sidewalk in a residential neighborhood.  *See* Doc. 124 at 79 (Officer Carrillo testified that "my recollection is that it was a welfare check, and female lying on the ground. And neighbors are calling in reference [to] a welfare check.").  *See also* Plaintiff's General Findings of Fact ("PGFF") ¶¶ 45, 53 (noting that neighbors "dialed 911 for an ambulance" and that medical personnel and police were dispatched "for a 'welfare check' only"); Defendant's Findings of Fact ("DFF") ¶ 1 ("On June 9, 2007 Officer Christopher Carrillo was dispatched to welfare check regarding a woman lying on a sidewalk."); Doc. 124 at 53 (Defendant Carrillo testified that they "were told that there was a female lying on the ground and neighbors were calling, and that the fire and ambulance were en route.").

2.   Upon arrival, Defendant Carrillo observed that a woman, whom he later learned to be Plaintiff Olga G. Venegas, was "lying on the ground, unresponsive."  Doc. 124 at 53.  *See also* Def. Ex. A at 2; Doc. 124 at 221 (witness Lindsay Laborin testified that "there was a lady laying on the

2

sidewalk near the rock wall in front of -- or to the side of and in front of our house.").

3.   At approximately the same time, personnel from the Las Cruces fire department and a private ambulance service arrived at the scene; accordingly, Defendant Carrillo permitted the other first responders to take charge of the welfare call.  *See* Def. Ex. A ("the fire department arrived at the same time."); Doc. 124 at 60 ("It was a medical call, so I was standing in the back, making sure that [medical professionals] were safe, because it would be more of a fire department and ambulance service that tended to Miss Venegas" and that "[u]nder the circumstances, my job is there to make sure that the fire department is safe and also the individual, meaning Miss Venegas."); *id.* at 243 (Lieutenant Hall of the Las Cruces Fire Department testified that "[t]he private ambulance company was already on scene, as well as the officers."). *See also* DFF ¶ 5 ("Fire Department personnel and ambulance company personnel had also arrived"); PGFF ¶ 63 ("Fire and emergency services personnel arrived shortly after the call to 911 by Billy and Denise Power, followed by Defendant Carrillo.").

4.   Shortly after Officer Carrillo arrived, a neighbor informed the officer that she believed that Plaintiff might have a history of seizures.  *See* Doc. 124 at 67 (Officer Carrillo testified that "I know [the neighbor] did make mention that she thinks she knows where [Plaintiff] lives and she may have a history of

3

seizures."); Doc. 122 at 79 (Plaintiff's witness, Antonia Denise Power, testified that "I don't recall, but I might have told them [the officers], somebody" that she believed that Plaintiff suffered from epilepsy.).  *But see* Doc. 122 at 53 (witness Antonia Denise Power testified that she did not "remember hearing someone say that they thought that they knew that she had seizures."); Doc. 122 at 126 (Antonia Power's husband, Billy Max Power, testified that he "[did not] remember the conversation" in which his wife purportedly informed the officers that she believed that Plaintiff suffered from epilepsy).

5. At some point during this initial encounter, a first responder approached Venegas and attempted to get her attention and assess the situation.  *See* Doc. 124 at 176 (Defendant Carrillo testified that "she was unresponsive.  Because of her unresponsiveness, [the fireman] tried to do a sternum rub.").  *See also id.* at 223 (witness Lindsey Laborin testified that "when [the first responders] would ask her who she was or where she lived, they were getting no response."); Doc. 122 at 57 (witness Antonia Denise Power testified that "[the first responders] did surround her and tried to look for, I guess, anything that might be, you know, wrong or something.  They did ask her her name.  She wouldn't answer.").

## II.   Plaintiff's Response to Police

6. Venegas responded to the first responders aggressively, both physically and by using vulgar language.  *See* Doc. 124 at 223 (witness Lindsey Laborin

continued that "I saw the officers ask her -- or let her know if she wasn't going

to respond, they were going to look at her purse to try to identify her.  And at

that point, that's when she became defensive, that she was trying to hit or

swing at the officers.").  *See also id.* at 235 (witness John T. Laborin testified

that "[a]fter the officers tried to find out who she was, one of the officers who I

was talking to, then I saw her start to kick and try to hit the officers when they

were trying to sit her up, move her" and that "I -- I think she -- at one point,

she said, Leave me the fuck alone.  I don't -- but I do remember swearing.");

DFF ¶ 6 ("At the time of the arrival of the Fire Department personnel, Plaintiff

was abusive, combative, aggressive, uncooperative, and refused to answer

questions.")

7.     Plaintiff was conscious during this ordeal and forcibly removed a first

responder's hand from her body.  *See* Doc. 124 at 55 (Officer Carrillo testified

that "[s]he grabbed [the fireman's] hand, cussed him out, and threw his hand

away from her, said Don't touch me.").  *See also* DFF ¶ 10 ("Plaintiff grabbed

the EMTs [sic] hand and threw it back.  She used profanity and stated 'Don't

touch me.'  Plaintiff seemed angry at the EMT."); Doc. 124 at 246 (Lieutenant

firefighter Hall testified that "She was conscious when I saw her, appeared to

be aware of who everyone was and what they were attempting to do, and just

being uncooperative.").

8.  At some point during this confusion, Officer Feliciano Garcia, also a licensed
    police officer with the Las Cruces Police Department, arrived on the scene in
    response to the call for a welfare check.  *See* Doc. 125 at 84 (Officer Garcia
    testified as to his employment with the Las Cruces Police Department); *id.* at
    88 (Officer Garcia testified that when he "arrived on the scene, [he] saw that
    Office Carrillo was there.").  *See also* Def. Ex. A (Officer Carrillo's police report
    notes that "Shortly after Officer Garcia pulled up.").

9.  Although witnesses Antonia Denise Power and Billy Max Power do not recall
    Plaintiff employing profanities, nothing in their testimony is inconsistent with
    the facts outlined above.  *See, e.g.*, Doc. 122 at 80 ("No, ***I don't remember***
    hearing any of that [swearing]" rather than an overt denial that it happened).

10. Moreover, while Plaintiff proposes that the Laborins "were not present on the
    scene," the testimony of Plaintiff's own witness does not support this view.
    *Compare* PGFF ¶ 54 *with* Doc. 122 at 49 (witness Antonia Denise Power
    testified that "[o]ther than the firefighters, police and ambulance, ***I don't
    remember anybody else being there.***") *and id.* at 94 (witness Antonia Denise
    Power agreed that the Laborins could "probably" have seen the events unfold
    in the street "if they had been out on the street on the other side of the wall"
    that separated the properties).  Further, there is no reason to suspect that ***two***
    third party witnesses unrelated to Defendants fabricated favorable testimony
    out of whole cloth; it is infinitely more likely that Antonia Denise Power

focused on the unfolding scene and simply did not see either John or Lindsey Laborin from her vantage point, as implied by her testimony.

11.  Plaintiff did not produce identification or respond to requests from the first responders to identify herself.  *See* Doc. 124 at 61 (Officer Carrillo testified that "[s]he was still ignoring [the fireman], as far as just not responding to any of the questions, if that's what you're asking.").

12.  To the contrary, when Officer Garcia attempted to locate an identification card or other identifying information in Plaintiff's purse, Plaintiff pulled the purse away from Officer Garcia, yelled a profanity at him, and then twisted Officer Garcia's fingers at the joints, causing him significant pain.  *See* Doc. 124 at 265 (Lieutenant Daniels testified that "when one of the officers attempted to grab [the purse], she reached up and pulled the purse back.  At another point when he attempted to grab it, she had grabbed his hand and twisted his hand."); Doc. 125 at 92 (Officer Garcia testified that when he tried to secure the purse, "she reached up and grabbed my fingers and clenched down on them.  As she did this, she twisted my hand and bent my finger backwards -- actually, all my fingers backwards."); Doc. 124 at 247 (Lieutenant Hall testified that "she stated to the officers, Fuck you, motherfucker.  And, Get the fuck out, and/or, Get the fuck away from me.  Various -- various uses of the F word, I remember.").  *See also* DFF ¶¶ 21-23 (describing the sequence of events).

### III.   Officer Garcia Elects to Arrest Plaintiff

13.   In an effort to induce Plaintiff to identify herself, Defendant Garcia warned
Venegas that he would arrest her for concealing her identity.  *See* Doc. 125 at
95 (Defendant Garcia testified that "she appeared to know -- to seem to know
what she was doing, that if she did not identify herself that I would arrest her,
and I told her I would arrest her for concealing identity" and "[m]y hope was
that my threat of, I'm going to arrest her, would help her to realize that we
were not joking around and that we needed to know if she was okay.").

14.   Despite continued attempts, Defendant Garcia was unable to learn Plaintiff's
identity; accordingly, he placed her under arrest.  *See* Doc. 125 at 95 (Officer
Garcia testified that "I gave her several attempts to give me her name and date
of birth or something, but she continued to lay there and look at me.  So I
advised her that I was going to arrest her, at which point in time I reached
down and grabbed her right arm and right elbow.  And I proceeded to use what
I was trained in the academy is called the shovel technique, to roll her over
onto her stomach to handcuff her.").

15.   Unfortunately, Plaintiff has only sporadic memories of these events, which
appears to result from a combination of the fact that she had just emerged
from a seizure and the fact that she suffers from general memory issues.  *See*
Doc. 123 at 238 (Plaintiff explained that "I honestly do not remember [meeting
opposing counsel before], but I can tell you I'm very forgetful."); *id.* at 259

("And after the [brain] surgery in 2009, that is when I became very, very forgetful, okay?"); *id.* at 277 (Plaintiff explained that she did not remember being moved to the police car because "I don't remember, sir. I was in the seizure still. I tell you, it takes me a long time."). *See also* Def. Ex. F at 5 (Plaintiff explained in an interview that she "just remember[s] telling the police officers to let me go" rather than other parts of the incident); *id.* at 7 (Plaintiff continued that "[i]t takes me a while to completely come out of it [the seizure]."); Doc. 123 at 25 (Plaintiff's expert, Dr. Treiman, testified that "She has memory loss, and the problem there is that it may have been related to the surgery" and that epilepsy may also "cause a progressive memory deficit simply because of repeated seizures"). Accordingly, the Court cannot credit her testimony regarding the events that occurred during her post-ictal haze very heavily because that testimony does not provide a complete narrative of what happened during that period of time.

## IV.    Plaintiff Violently Resists Arrest

16.   As Defendant Garcia began to restrain Plaintiff, she "became combative" and "began to thrash around and yell and scream and curse." Doc. 125 at 96. During this struggle, "[s]he managed to get her right arm away from [Officer Garcia] as [he] was putting [his] knee down across the middle of her shoulder blades, and she was flailing it around." *Id. See also id.* at 97 (Officer Garcia testified that "I'm still rolling her over, attempting to hold onto her arm, but she's pulling it away, yelling, screaming, cussing, kicking.").

17. The officers attempted to roll Plaintiff from her back to her stomach in order to handcuff her wrists behind her, while keeping her in an immobile position. *See* Doc. 125 at 96-97 (Defendant Garcia testified that Plaintiff was on her back, he "advised her she was under arrest," and then he tried to roll her to "the left"). *See also* DFF ¶¶ 30-33 (describing the handcuffing procedure); Def. Ex. A (Officer Carrillo's police report states that "we rolled her around to her stomach.").

18. After the officers handcuffed Plaintiff, they attempted to secure her in a patrol car, but Plaintiff continued to resist. *See* Doc. 125 at 104 (Defendant Garcia testified that "we tell her to sit up and stand up but she still was not cooperating. She was yelling, screaming, cursing as I've said before. We eventually lift her up and tell her to walk to the police unit. She was not cooperating. She was still grabbing at my hands, attempting to grab my fingers or whatever she could. She was also kicking at myself and Officer Carrillo several times, I received several glancing blows."). *See also* DFF ¶¶ 36-43 (describing the resistance); Doc. 124 at 235 (witness John T. Laborin testified that "I saw her start to kick and try to hit the officers when they were trying to sit her up, move her."); Def. Ex. F at 7 (Plaintiff states in her interview that she "wasn't cooperating with [the officers]. I was trying to tell them to let me go.").

19. Even once the officers managed to move Plaintiff to the patrol car, she continued to resist the arrest forcibly and would not comply with police commands. *See* Doc. 125 at 104 (Defendant Garcia testified that "[a]fter Officer Carrillo got the door open, we attempted to put her inside. We said, Sit down. She would not sit down. We were telling her, Sit down, sit down. She would not comply. She eventually lifted up one of her legs and used it to brace herself against the door frame."); Doc. 124 at 143-44 (Defendant Carrillo testified that he engaged in a "sweep" when Plaintiff "had her foot braced against the doorframe and not allowing us to get her" in order to knock her foot off the door frame); *id.* at 223 (witness Lindsey Laborin testified that "as [Plaintiff] was placed in the cop car, she was kicking them."). *See also* Doc. 124 at 182 (Officer Carrillo testified that "as we were trying to walk her [to the police car], she's taking turns kicking me with her foot that's up. And taking turns, you know, kicking him with the foot that's up as she's walking to the unit.").

20. Ultimately, the officers subdued Venegas in the police vehicle. *See* Def. Ex. F. (Plaintiff explained in an interview that "[the officers] pushed me into the car. And I didn't want to get in.").

21. In the process, Plaintiff claims that her head struck the top of the vehicle's door frame, but there is no evidence to suggest that the officers intended for her head to make contact with the car; rather, it may have been an inadvertent

result of the officer's efforts to secure Plaintiff in the patrol car.  *See* Doc. 123

at 189 (Plaintiff testified that "they forced me in the car.  And I remember

being banged on the head.  I don't know – I remember my head being banged

on the upper part of the car, because they wanted to get me in the car.").

22.   There is no allegation that Defendants used excessive force after this point.

*See, e.g.*, PGFF ¶¶ 83-86.


## V.   Indications of Plaintiff's Medical Condition

23.   The emergency call requesting the welfare check did not mention that Plaintiff

might suffer from epilepsy or that she had a history of seizures; instead, the

call merely indicated that Venegas was "not responsive and laying on the

ground," and alluded to the heat of the day.  Doc. 122 at 74-75.

24.   Plaintiff gave no indication, verbal or otherwise, that she had been diagnosed

with epilepsy or that she had just suffered a seizure.  *See* Doc. 125 at 149

(Defendant Garcia testified that Plaintiff never mentioned that she suffered

from epilepsy).  Indeed, none of the eyewitnesses questioned at trial mentioned

anything that would imply that Plaintiff told the officers that she had just

suffered a seizure.  *See, e.g.*, Doc. 122 at 47 (Antonia Denise Power testified

that "I just remember hearing her say, Leave me alone" rather than protesting

that she had just emerged from a seizure).

25.   While Plaintiff testified that she informed the officers that she had just had a
seizure, *see* Doc. 123 at 186, as discussed above, the Court does not credit this
testimony because it is not corroborated by third-party testimony and because
Plaintiff admittedly suffers from memory issues and had, at the time of the
incident, just emerged from a seizure.  *See, e.g.*, *id.* at 238 (Plaintiff testified
that "I can tell you I'm very forgetful."); *id.* at 277 (Plaintiff testified about
being taken to the police car:  "I don't remember, sir.  I was in the seizure still.
I tell you, it takes me a long time.").

26.   On the date in question, Plaintiff wore no visible indication, such as a medical
alert bracelet, that she suffered from epilepsy.  *See* Doc. 123 at 228 (Plaintiff
explained that she carried a medical identification card ***rather than*** a medical
alert bracelet or necklace); *id.* at 252 (Plaintiff initially conceded that she did
not remember whether she "was wearing the medical bracelet" on that day).
*See also* Doc. 122 at 75 (Antonia Denise Power responded to the emergency
dispatcher that Plaintiff was not wearing a medical alert bracelet); Doc. 123 at
97-98 (Plaintiff's son testified that in 2007, Plaintiff did not have a medical
alert bracelet); Def. Ex. F at 17 (Plaintiff conceded in an interview that, on the
date in question, she did not wear any visible symbol that would advise
emergency personnel of her condition, such as a bracelet or a dog tag).

27.   Plaintiff did, however, wear a bracelet intended to be used in conjunction with
a vagus nerve stimulator.  *See* Doc. 123 at 256 (Plaintiff testified in her

deposition that, on the date of incident, she "just had the vagus nerve
stimulator" rather than any other visible indication).

28.   This vagus nerve bracelet did not bear any visible indication that it was
      intended for use by epileptics and was only discovered once the officers began
      to handcuff Plaintiff.  *See* Doc. 124 at 126 (Officer Carrillo testified that he
      "had an officer, fireman, that was making mention of her wrist after she had
      already -- after we were already attempting to handcuff her."); Def. Ex. F at 17
      (Plaintiff conceded in the interview that her vagus nerve stimulator "doesn't
      have any symbols on it, [like] that medical alert symbol--").

29.   Indeed, while officers eventually found a New Mexico state identification card,
      only Officer Carrillo observed a medical information card, and only after
      Plaintiff had been secured in the patrol car.  *See* Doc. 125 at 109 (Defendant
      Garcia testified that he did not observe pillboxes or a medical identification
      card and only found a New Mexico identification card).  *See also* Doc. 124 at
      211 (Officer Carrillo affirmed that he saw the "medical identification card" only
      "after she was in the car").

30.   Neither of the firefighters who testified, both of whom have received medical
      training, including specific training regarding seizure disorders, believed that
      Plaintiff's conduct definitively indicated that she had just emerged from a
      seizure.  *See* Doc. 124 at 265 (Lieutenant Daniels testified that "I mean, she
      could have been intoxicated.  The way she was presenting from the distance

that I was, it could have been an intoxicated person, somebody on drugs.  Very well could have been a seizure patient.  Potentially a diabetic patient."); *id.* at 248-49 (Lieutenant Hall testified that "she did not appear to be suffering from a seizure or any post-seizure effects that I've been familiar with.  She seemed very lucid, was awake" and "I've never seen anyone be as aggressive and direct and able to appear to consciously be, you know, verbally attacking everyone who is trying to help them.").

31. Similarly, Officer Carrillo, who also suffers from epilepsy and is therefore "[m]ore informed" regarding seizures, had "never heard of any outbursts, as far as the postictal phase" of seizures is concerned.  Doc. 124 at 171.  *See also id.* at 205 (Officer Carrillo continued "I mean, the way -- behavior she displayed was completely new to me.  So I didn't know if I had her coming out of a seizure and then this is what's going on, or she was actually just doing this intentionally.").

32. While one of Plaintiff's experts testified that "there are patients who, after they have had a seizure and are postictal, will physically resist being touched or being held, and will, if they're on the ground, may strike out if somebody's trying to hold them down," this testimony is largely irrelevant.  Doc. 122 at 181.  That is, although the emergency personnel may have ultimately been incorrect in their assessment of the situation, the expert testimony does not establish either that a seizure was the ***only*** reasonable explanation for Plaintiff's behavior, or that the emergency personnel were unreasonable for not

identifying Plaintiff's post-ictal symptoms.  *See* Doc. 123 at 29 (Plaintiff's
expert, Dr. Treiman conceded that "just looking at the behavior" a lay person
could not distinguish between "resistive" post-ictal behavior and "good old-
fashioned violence").  Stated otherwise, Plaintiff's expert testimony appears
properly directed at establishing that Plaintiff indeed suffered a seizure on the
date of her arrest, a fact not genuinely in dispute, rather than proving that the
Defendants acted unreasonably or should have known that Plaintiff's
symptoms indicated post-ictal confusion.

33.   In short, there was very little information available to the officers that would
have indicated conclusively that Plaintiff is an epileptic, much less that she
had suffered a seizure immediately prior to their arrival.  *See, e.g.*, Doc. 124 at
200 (Officer Carrillo testified that, even with the benefit of hindsight:  "I still
thought that the demeanor may or may not have been from the seizure.  I
didn't know conclusively that her behavior was related to a post-seizure
episode."); *id.* at 205 (Officer Carrillo continued that, "I couldn't, I didn't have
enough – I understand the bracelet, I understand the neighbor.  I just didn't
know if I had enough right now to make a determination if it's just all seizure-
related, because everything I knew to that point did not coincide with
somebody like people I have seen come out of seizures, people that have told
me how I look when I come out of seizures.").

## CONCLUSIONS OF LAW

### I.    Section 1983 and Qualified Immunity

1.    All of Plaintiff's claims arise under 42 U.S.C. § 1983.  *See, e.g.*, Doc. 38 at 3 (explaining that "Plaintiff has filed this action under 42 U.S.C. § 1983, which provides for a cause of action against state officers for depriving individuals of their rights under federal law or the United States Constitution.").

2.    The doctrine of qualified immunity ordinarily "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244-45 (2012).

3.    Here, although the Court partially denied Defendants' Motion for Summary Judgment [Doc. 4], the Court did not decide whether Defendants are entitled to the protection of qualified immunity on any set of facts.  *See* Doc. 38 at 1. Instead, the Court held that, "on [the] minimal evidence" then-available to the Court, summary judgment was not appropriate at that juncture; that is, the Court found that material issues of fact in this case necessitated a trial.  *See id*. at 6, 17.

4.    Accordingly, the Court still may engage in the ordinary two-prong qualified immunity analysis, even though it declined to grant summary judgment on this basis.  *Cf. Gonzales v. Duran*, 590 F.3d 855, 859-60 (10th Cir. 2009) (explaining the procedure for submitting qualified immunity to a jury at trial).

17

5.    The two prongs of qualified immunity anaylsis require the Court to determine (1) whether "the defendant's actions violated a [federal] constitutional or statutory right" and (2) whether the right in question "was clearly established at the time of the defendant's unlawful conduct." *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001) (internal quotation marks omitted).

6.    It is settled law that the Court may elect "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

## II.   Unlawful Arrest

7.    Officers are immune from any suit arising from an allegedly unlawful arrest if there was "arguable probable cause" to arrest the plaintiff. *See, e.g.*, *Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014) ("In the context of a qualified immunity defense on an unlawful search or arrest claim, we ascertain whether a defendant violated clearly established law by asking whether there was arguable probable cause for the challenged conduct.") (internal quotation marks omitted).

8.    Accordingly, where, as here, "a warrantless arrest is the subject of a § 1983 action, the arresting officer is entitled to qualified immunity if a reasonable officer could have believed that probable cause existed to make the arrest."

*Robertson v. Las Animas Cnty. Sheriff's Dep't*, 500 F.3d 1185, 1191 (10th Cir. 2007).

9.  Moreover, the arrest was lawful if the facts available to the officers furnished arguable probable cause to believe that Venegas had committed ***any*** crime for which she could be arrested.  *See Apodaca v. City of Albuquerque*, 443 F.3d 1286, 1289 (10th Cir. 2006) ("All that matters is whether [the officer] possessed knowledge of evidence that would provide probable cause to arrest her on *some* ground.) (emphasis original); *United States v. Turner*, 553 F.3d 1337, 1345 (10th Cir. 2009) ("the probable cause inquiry is not restricted to a particular offense, but rather requires merely that the officer had reason to believe that a crime—any crime—occurred.").

10. That is, "[e]ven law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity."  *Morris v. Noe*, 672 F.3d 1185, 1194 (10th Cir. 2012) (internal quotation marks omitted).

11. New Mexico state law defines "battery on a peace officer" as "the unlawful, intentional touching or application of force to the person of a peace officer while he is in the lawful discharge of his duties, when done in a rude, insolent or angry manner."  N.M.S.A. § 30-22-24.

12. Here, although Officer Garcia told Venegas that he placed her under arrest for "concealing identity," there can be no genuine dispute on the facts articulated

above that he had "arguable probable cause" to arrest Plaintiff for battery on a peace officer.  First, the evidence plainly establishes that, at the time of the incident, Defendants Carrillo and Garcia were engaged in the "lawful discharge" of their duties, by responding to an emergency call for a welfare check.  Second, Defendants had ample reason to believe that Plaintiff had engaged in the "unlawful, intentional touching or application of force to the person of a peace officer" in a "rude, insolent or angry manner" when she violently twisted Officer Garcia's fingers.  While Plaintiff may argue that this conduct was rendered unintentional by Plaintiff's post-ictal haze, it cannot be seriously argued that, on the facts determined by the Court, Defendants ***unreasonably*** believed that Plaintiff's conduct was intentional and unlawful. Stated otherwise, based on the information available to the officers, which included no strong indication that Plaintiff had just suffered a seizure, a "reasonable officer could have believed that probable cause existed to make the arrest." *Robertson*, 500 F.3d at 1191.

13.   Thus, the Court concludes that Defendants did not violate Plaintiff's Fourth Amendment right to be secure from unlawful arrest.  Therefore, Plaintiff cannot sustain a § 1983 claim for unlawful arrest against the Defendants; the Court will enter judgment in the Defendants' favor as to this count.

## III.   Excessive Force

14. In a claim for excessive force under § 1983, "the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Morris,* 672 F.3d at 1195 (internal quotation marks omitted).

15. "In determining whether the use of force is reasonable in a particular situation, [the Court should] consider (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to flee." *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  This list of factors is, of course, non-exhaustive.  *See Koch v. City of Del City*, 660 F.3d 1228, 1246 (10th Cir. 2011) (internal quotation marks omitted).

16. When confronted with a § 1983 claim for excessive force, the Court "must take care to judge the situation from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 664-665 (10th Cir. 2010) (internal quotation marks omitted).

17. Here, the Court finds that Defendants employed reasonable, not excessive, force in arresting Plaintiff.  First, the officers had probable cause to arrest Plaintiff for, among other offenses, battery on a peace officer, a relatively significant violent felony.  Second, Plaintiff was a threat to the officers at the time that they arrested her.  Indeed, the officers already had probable cause to

21

arrest Plaintiff for battering them.  That is, by the time the officers arrested

Plaintiff, she had ***already*** used force against the officers, such that it was

reasonable for them to anticipate that she would continue to use physical force

to resist arrest.  Third, even Plaintiff admits that she forcibly resisted arrest;

by the account of the officers and witnesses, Plaintiff thrashed and kicked in

resistance.  When these three factors are viewed in light of the fact that the

officers employed standard stabilization and handcuffing techniques and the

fact that Plaintiff suffered only minimal abrasions as a result of the arrest, the

Court concludes that the officers employed reasonable force in arresting

Plaintiff.  *See* Pl. Ex. 2A-2L (photos of Plaintiff's injuries).

18.   Thus, the Court concludes that Defendants did not violate Plaintiff's Fourth

Amendment right to be free from arrests carried out with excessive force.

Therefore, the Court will enter judgment in Defendants' favor as to Plaintiff's

excessive force claim.

## IV.   Equal Protection

19.   "Generally, to state a claim under § 1983 for violation of the Equal Protection

Clause, the plaintiff must show the defendant acted under color of law and

discriminated against him or her." *Griego v. City of Albuquerque*, 100 F. Supp.

3d 1192, 1222 (D.N.M. 2015).

20.   Moreover, to prove an equal protection violation, Plaintiff must show that

discriminatory intent motivated Defendants' conduct. *Pushkin v. Regents of*

22

*Univ. of Colo.*, 658 F. 2d 1372, 1384 (10th Cir. 1981) (citing *Washington v. Davis*, 426 U.S. 229 (1976)).

21.  Such intent "implies more than intent as volition or intent as awareness of consequences.  It requires that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of[,]" its adverse effects upon the class of persons in question.  *SECSYS, LLC v. Vigil*, 666 F. 3d 678, 685 (10th Cir. 2012) (citations and quotations omitted).

22.  Nothing in the evidence before the Court suggests that Defendants treated Plaintiff differently ***because of***, rather than ***in spite of***, her disability.  Thus, this claim must fail.

23.  Indeed, Plaintiff appears largely to concede this claim in her post-trial brief, arguing only that "Defendant Carrillo and Defendant Garcia knew or should have known why Plaintiff did not respond to their requests to provide her name and address.  They knew that she could not help her dazed and confused condition.  Such knowledge is equivalent to intent no different than charging a visibly pregnant woman with indecent exposure after she has a miscarriage on the side walk and collapses."  That is, in Plaintiff's view, "Defendant Carrillo testified that he does not ordinarily arrest folks for lying across the side walk so as to inhibit pedestrian traffic.  This is evidence that Defendant Carrillo was motivated by Plaintiff's medical condition to treat her differently than other people he encountered."  Doc. 136 at 30-31.  However, the Court has already

determined that, at the time of the arrest, Defendants were largely unaware of Plaintiff's medical condition, such that it is unclear how this knowledge would have motivated their conduct.

24.   Moreover, even the very case cited by Plaintiff undoes her argument.  In *McBeth v. Himes*, the Tenth Circuit explained in the context of a First Amendment retaliation claim brought pursuant to § 1983 that when "the qualified immunity inquiry turns on a subjective element, as it does when examining motive, the qualified immunity analysis is modified slightly." *McBeth v. Himes*, 598 F.3d 708, 724 (10th Cir. 2010) (internal quotation marks omitted).  In such instances, a "defendant must do more than merely raise the [qualified] immunity defense; he must make a prima facie showing of the objective reasonableness of the challenged conduct." *Id.* (modification original, internal quotation mark omitted).  "If the defendant makes this prima facie showing, the plaintiff must then produce specific evidence of the defendant's culpable state of mind to survive summary judgment." *Id.* at 724-25 (internal quotation marks omitted).  Here, as discussed above, Defendants have amply made a *prima facie* showing of objective reasonableness; the Court so held when it found that the officers arrested Plaintiff based on arguable probable cause and did not use excessive force.

25. Absent any additional showing from Plaintiff that discriminatory intent motivated Defendants' conduct, the Court cannot find that Defendants violated Plaintiff's Fourteenth Amendment right to equal protection.

26. Therefore, the Court will enter judgment in Defendants' favor as to Plaintiff's equal protection claim.

## V.   Damages

27. As is apparent from the three prior subsections, judgment will be entered in Defendants' favor on each of Plaintiff's counts, such that there is no liability in the instant case.

28. As an additional matter, however, the Court notes that Plaintiff has proven no damages; at no point during the four-day bench trial did Plaintiff introduce evidence regarding the value of Plaintiff's damages, nor whether punitive damages would be appropriate in this case.

29. Ultimately, however, this point is entirely academic, as the Court finds in Defendants' favor as to each count and, therefore, need not assess the value of damages.

## CONCLUSION

The foregoing reasons compel the Court to enter judgment in favor of Defendants as to each of Plaintiff's claims.  Even so, the Court takes this opportunity to note that the mere fact that the law does not afford Plaintiff

monetary recovery on these facts does not mean that the Court does not feel profound sympathy for the ordeal through with Mrs. Venegas has suffered.  Plainly, the incident at the heart of this case could have been resolved without force and with considerably more compassion for Mrs. Venegas.  The Court does not doubt the sincerity of the trauma that Mrs. Venegas and her family described during trial and understands the disappointment that they must feel with this verdict.

However, this Court is not empowered to sit in equity and remedy all harms brought before it.  Rather, the Court is bound to apply the law without favor.  In this case, such application leaves no possible conclusion other than to find that neither Defendant Carrillo nor Defendant Garcia violated Plaintiff's clearly-established constitutional rights, such that qualified immunity bars Plaintiff from recovering for the harms she has suffered.

Dated this 4th day of February, 2016.

_____
**MARTHA VÁZQUEZ**
UNITED STATES DISTRICT JUDGE


Paul M. Gayle-Smith
**Law Offices of Paul M. Gayle-Smith**
Las Cruces, New Mexico
***Attorney for Plaintiff Venegas***

William R. Babington, Jr., *et al.*
**City Attorney's Office**
Las Cruces, New Mexico
***Attorney for Defendants***